UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
Jewel Redhead,                              :
                                            :
                    Plaintiff,              :          **MEMORANDUM AND ORDER**
                                            :
        -against-                           :          03-CV-6187 (DLI)
                                            :
Conference of Seventh-day Adventists,       :
                                            :
                    Defendant.              :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Jewel Redhead filed suit against defendant Conference of Seventh-day Adventists

claiming that the Linden Seventh-day Adventists School (the "Linden School") improperly

terminated her for being pregnant and unmarried. Plaintiff asserts claims under (1) Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as amended by the Pregnancy

Discrimination Act of 1978, (2) the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq.,

and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. Upon considering

defendant's motion for summary judgment, the court denies the motion for the reasons set forth

below.


I.      **Facts**

Plaintiff Jewel Redhead began working as a teacher at the Linden School, located in

Laurelton, New York, at the start of the 1998–99 academic year. The Linden School is operated by

the Northeastern Conference of Seventh-day Adventists ("Northeastern Conference"). Plaintiff was

raised as a member of the Seventh-day Adventist Church. During the 1998–99 and 1999–2000

1

school years, plaintiff taught third grade at the Linden School. For the 2000–01 school year, the principal of the Linden School asked plaintiff to switch to teaching fifth grade. Plaintiff taught one hour of Bible study per day and spent the remainder of her day teaching secular subjects. Though the Linden School conducts a morning worship service for teachers every day, teachers only attend worship services with students once a year for the School's graduation ceremony. The students who attend the Linden School are not required to be Seventh-day Adventists, though, according to defendant, "[p]arents send their children to Adventists' schools, in part, so their children may obtain an education that complies with the teachings of the Church." (Barnes Decl. ¶ 9.)

At the end of the first week of classes of the 2001–02 school year, sometime in September 2001, plaintiff informed Beverly Cameron ("Ms. Cameron"), the Linden School principal, that she was pregnant. Ms. Cameron asked plaintiff whether she intended to follow through with the pregnancy, to which plaintiff replied that she did, and whether she intended to marry the father of the unborn child, to which plaintiff responded in the negative. Ms. Cameron told plaintiff that she would have to speak to the Superintendent of Schools of the Northeastern Conference, Polly-Anna Prosper Barnes ("Ms. Barnes"), Ms. Cameron's direct supervisor. According to plaintiff, she approached Ms. Cameron a few times to inquire whether Ms. Cameron had spoken to Ms. Barnes. On one occasion, plaintiff recalls Ms. Cameron reporting that Ms. Barnes was surprised at plaintiff's pregnancy and that Ms. Barnes would "get back to [her]." (Redhead Dep. at 84.) In the meantime, plaintiff claims that Ms. Cameron told her to wear loose clothing to conceal her pregnancy. Plaintiff says that she found such comment "offensive" but did not inquire why Ms. Cameron wanted her to cover her stomach. (*Id*. at 86–88.) Plaintiff also had a conversation with Ms. Cameron about pregnancy benefits during this time. Plaintiff recalls being told by Ms. Cameron sometime in

September that she would probably be terminated.

At some point before the termination, Ms. Barnes spoke to plaintiff over the telephone and asked her whether she intended to marry the father of the child. Upon plaintiff's negative response, Ms. Barnes informed plaintiff that she would have to bring the matter to the attention of the governing board of the school and initiate termination proceedings. On November 19, 2001, the School Board of the Northeastern Conference decided to terminate plaintiff "[i]n that [p]laintiff's pregnancy outside of marriage was evidence of fornication." (Barnes Decl. ¶ 14.) By letter dated November 21, 2001, Ms. Barnes notified plaintiff that the Board had voted to terminate her employment, effective as of November 30, 2001, for exhibiting "immoral or unsatisfactory personal conduct inconsistent with the principles of the Seventh-day Adventist Church," as provided in § 3038:99 of the *Atlantic Union Conference Education Code* ("AUCEC"). (Def.'s Ex. K.) Plaintiff testified at her deposition that when she asked Ms. Cameron why she was being fired for being pregnant, Ms. Cameron responded, "That's how it is done." (Redhead Dep. at 96.)

Plaintiff and defendant present different interpretations regarding whether plaintiff was required to be a member of the Seventh-day Adventist Church to teach at the Linden School and whether plaintiff had adequate notice of any such policy. Plaintiff disputes Ms. Barnes' statement that every teacher must be a member of the Seventh-day Adventist Church and relies on the following language from the Linden School's employment application:

> Seventh-day Adventist conferences are religiously qualified *equal opportunity employers*, with the right *to prefer* Seventh-day Adventists in hiring. . . . Seventh-day Adventist conferences do not discriminate against qualified applicants on account of race, color, sex, age, military veteran status, national origin, ancestry, marital status, or mental or physical handicap/disability.

(Def.'s Ex. E at 4 (second emphasis added).) The employment agreement, however, while stating

3

that the Northeastern Conference "*wishes* to employ personnel who follow the standards and teachings of the Seventh-day Adventist Church," provides:

> Employee agrees to be a member of, and attend regularly, a Seventh-day Adventist Church that is a constituent of the school where Employee is employed. In the case of boarding academics, this means the academy church. Faithful returning of the tithe to the church of membership is a condition of employment.

(Def.'s Ex. F (emphasis added).) Plaintiff admitted during her deposition that she signed the employment agreement for her first year at the Linden School without reading it. She remembers signing an agreement for the 1999–2000 school year but not for the 2000–01 school year. Plaintiff testified at her deposition that she recalled being told during her interview that she was expected to observe the precepts of the Seventh-day Adventist Church in order to teach at the Linden School. She also testified that she understood that the Linden School expected her to be and remain a member in good standing of the Seventh-day Adventist Church.

The employment agreement states that the employee and employer shall "be bound by the policies regarding educational matters . . . as set forth in the *Teachers' Handbook*, or any other published material attached to [the] agreement, . . . the *Atlantic Union Education Code Book* [the AUCEC] . . . [,] and the . . . *North American Division Working Policy*." (Def.'s Ex. F.) The agreement provides that the employee's signature indicates that he or she has read all documents listed in the agreement or that he/she has waived the right to read such documents. (*Id.*) Section 3038:99 of the AUCEC provides:

> Termination is discontinuance of salary and employment at any time by the employing organization, at their sole discretion. An employee may be terminated for, but not limited to, the following reasons: . . . Immoral or unsatisfactory personal conduct inconsistent with the principles of the Seventh-day Adventist Church.

(Def.'s Ex. I.) The *Seventh-day Adventist Church Manual* (16th ed., rev. 2000) lists "fornication"

under "grievous sins for which members shall be subject to discipline." (Def.'s Ex. J at 184.) Plaintiff does not recall being given a copy of the *Teachers' Handbook* or the AUCEC. Plaintiff also denies being aware that "immoral or unsatisfactory personal conduct" could be grounds for termination at the Linden School. (Redhead Dep. at 99.) Plaintiff states that she was unaware that having sexual relations outside of marriage was contrary to the teachings of the Seventh-day Adventists. (*Id.* at 73–74.)

In arguing that she was singled out for termination because of her pregnancy, plaintiff maintains that other teachers at the Linden School were having sexual relations outside of marriage, which she knew based on "talking with them about their relationships." (Redhead Dep. at 79.) However, she admits to having no knowledge whether any member of the Linden School administration has ever been privy to information about such conduct. Plaintiff testified that she was aware of one teacher who taught at the Linden School while pregnant and separated from her husband during at least part of the pregnancy.

Following her termination, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 29, 2002, alleging discrimination based on her gender, pregnancy, and marital status in violation of Title VII. On September 10, 2003, the EEOC issued a Dismissal and Notice of Rights, indicating that it was closing plaintiff's file because it was "unable to conclude that the information obtained establishes violations of the statutes" but that there was no "certif[ication] that the respondent is in compliance with the statutes." (Def.'s Ex. C.)

## II.     Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The court must view all facts in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).  In drawing inferences in favor of the nonmoving party, "the court is not entitled to weigh the evidence." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000).  Nevertheless, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  The court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.     Subject Matter Jurisdiction

The threshold issue to address is defendant's argument that the present case is barred by the Free Exercise Clause of the First Amendment for lack of subject matter jurisdiction.  Generally, religious organizations have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952).  Section 702 of Title VII provides that the statute does not apply "to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the

carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1.  On the other hand, courts have consistently held that "Title VII does not confer upon religious organizations a license to make . . . [hiring] decisions on the basis of race, sex, or national origin." *Rayburn v. Gen. Conference of Seventh-day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985); *see also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

Defendant argues that its hiring decisions regarding plaintiff are immune under the "ministerial exception" to Title VII.  In adopting the "ministerial exception" under the principles of the First Amendment, courts have held that a religious organization's hiring decisions regarding ministers and clergy are completely immune from Title VII challenge.  *See, e.g.*, *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 790 (9th Cir. 2005) ("the 'ministerial exception' to Title VII is carved out from the statute based on the commands of the Free Exercise and Establishment Clauses of the First Amendment"); *Rayburn*, 772 F.2d at 1169.  While churches and religious organizations may be subject to Title VII in some circumstances, for example in sexual harassment suits, courts have held that hiring decisions are protected because "[a] church's selection of its own clergy is [a] core matter of ecclesiastical governance with which the state may not constitutionally interfere. A church must retain unfettered freedom in its choice of ministers because ministers represent the church to the people." *See Elvig*, 397 F.3d at 794 (quoting *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972)).

Although the Second Circuit had neither explicitly rejected nor adopted the "ministerial exception" at the time the parties submitted their motion papers, in *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006), this circuit recently cast doubt over this common law doctrine in favor of a statutory interpretation under the Religious Freedom Restoration Act ("RFRA").  The court in *Hankins* held

that the RFRA is constitutional as applied to federal law[1] and should be considered where a party's argument is, in essence, that a statute substantially burdens its exercise of religion.  441 F.3d at 99, 102.  The RFRA provides in relevant part:

> (a) In general.  Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

> (b) Exception.  Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1.

In *Hankins*, the court concluded that, where the plaintiff clergy member challenged the United Methodist Church's mandatory retirement age of 70 as a violation of the Age Discrimination in Employment Act ("ADEA"), the proper inquiry was not the applicability of the "ministerial exception" but rather an analysis under the RFRA, which the court held should be read as an amendment to the ADEA.  441 F.3d at 99, 102, 109.  The court held:  "Given the absence of other relevant statutory language, the RFRA must be deemed the full expression of Congress's intent with regard to the religion-related issues before us and displace earlier judge-made doctrines that might have been used to ameliorate the ADEA's impact on religious organizations and activities."  *Id*. at 102.  This holding is appropriately extended to Title VII employment discrimination cases.  *See id*. at 103, 106, 109 (noting the RFRA's applicability to "all Federal law," that the RFRA "does not violate the Establishment Clause of the Constitution," and that, in having the power to enact the

---

[1] The Supreme Court held the RFRA unconstitutional as applied to state law in *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997).

ADEA, Congress had power to amend the ADEA by enacting the RFRA); *see also Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 316 (2d Cir. 1999) ("The same standards govern disparate treatment claims arising under either Title VII or the ADEA.").

As in *Hankins*, the defendant here has not raised an RFRA defense, but the *Hankins* court noted that "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." 441 F.3d at 104–05 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991)).

In remanding *Hankins* to the district court for reconsideration under the RFRA, the Second Circuit did not provide any instruction on how the RFRA should be applied. As the district court has not yet issued a decision following remand, this court is the first to consider how to analyze an employment discrimination issue under the RFRA—here, specifically in the context of the Conference of Seventh-day Adventist's position that the court's intrusion upon its decision to terminate plaintiff would substantially burden its exercise of religion.

The court has strong reservations in proceeding on the assumption that the RFRA is applicable in a suit between private parties, especially considering the plain language of the statute that a party asserting an RFRA claim or defense may "obtain appropriate relief against *a government*," 42 U.S.C. § 2000bb–1(c) (emphasis added). *See, e.g.*, *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) ("RFRA is applicable only to suits to which the government is a party."); *Hankins*, 441 F.3d at 115 (Sotomayor, J., dissenting) ("[T]he majority concedes that it is unable to locate a single court holding that directly supports its novel application of RFRA to a suit between private parties. . . . This is telling, for Congress enacted RFRA over

twelve years ago. The plain language of the statute, its legislative history, and its interpretation by courts over the past twelve years demonstrate that RFRA does not apply to suits between private parties."). However, the court is constrained to follow *Hankins*, wherein the Second Circuit stated that it was unnecessary to "decide whether the RFRA applies to a federal law enforceable only in private actions between private parties," because the ADEA is enforceable by the EEOC as well as private parties, and "the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Hankins*, 441 F.3d at 103. The same reasoning is applicable to Title VII, which is also enforceable by the EEOC.

### Application of the RFRA

Defendant's argument in essence lays out the prima facie case under the RFRA: that the application of Title VII would (1) substantially burden its (2) sincere (3) religious exercise of ensuring that teachers at the Linden School follow the teachings of the Seventh-day Adventist Church. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 126 S. Ct. 1211, 1219, 163 L. Ed. 2d 1017 (2006). The compelling interest test required under the RFRA "is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id*. at 1220. Thus, the court must look at the specific facts and circumstances presented by the case before it.

In *O Centro Espírita*, decided less than one week after *Hankins*, the Supreme Court held that "*judicially crafted* exceptions" are relevant when applying the RFRA's compelling interest test. *Id*. at 1223 (emphasis in original). The court stated: "[The] RFRA . . . plainly contemplates that *courts* would recognize exceptions—that is how the law works. . . . [The] RFRA makes clear that it is the

obligation of the courts to consider whether exceptions are required under the test set forth by Congress." *Id*. (emphasis in original). Under consideration in *O Centro Espírita* was whether the Controlled Substances Act, 21 U.S.C. § 801 et seq., burdened the religious exercise of a Brazil-based Christian Spiritist sect, with a U.S. branch of approximately 130 members, by proscribing its use of a plant to make its communion sacramental tea, *hoasca*.[2] The Court, in applying the RFRA compelling interest test, noted that Congress had carved out exceptions to the Controlled Substances Act for peyote use, possession, and transportation by all members of recognized Indian tribes, 42 U.S.C. § 1996a(b)(1), and for peyote use in Native American Church ceremonies, 21 C.F.R. § 1307.31, but that this did not preclude other substances from *judicial* exclusion, as necessary under the RFRA. *Id*. at 1222–23. The Court reaffirmed the "the feasibility of case-by-case consideration of religious exemptions to generally applicable rules." *Id*. at 1223 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)). The court emphasized the language in the RFRA that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise" and that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." *Id*. at 1225 (quoting 42 U.S.C. §§ 2000bb(a)(2), (5)).

In the case at bar, the court notes that, generally, Title VII's purpose of eradicating employment discrimination is a "compelling government interest." *See, e.g.*, *Werft v. Desert Southwest Annual Conference of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004); *E.E.O.C. v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 810 (S.D. Ind. 2002). "Title VII provides

---

[2] One of the plants used to make *hoasca*, *psychotria viridis*, contains dimethyltryptamine (DMT), a hallucinogen listed in Schedule I of the Controlled Substances Act, 21 U.S.C. § 812(c).

a uniform approach to eradicating employment discrimination in its various manifestations." *Preferred Mgmt. Corp.*, 216 F. Supp. 2d at 811. With regard to religious considerations in Title VII, Section 702 exempts religious organizations from hiring decisions related to religion. Yet, Title VII's protections are not limited to what is stated in the statute itself and include significant judicially created law, for example, the *McDonnell Douglas* burden-shifting framework, *infra*, or the development of hostile work environment / sexual harassment law in cases such as *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).

Thus, even if an analysis under the RFRA is appropriate, the RFRA and the ministerial exception are not mutually exclusive. *See O Centro Espírita*, 126 S. Ct. at 1222 (holding "*judicially crafted* exceptions" relevant to RFRA analysis); *see also Hankins*, 441 F.3d at 102 (labeling the ministerial exception "an unresolved issue in this circuit"). This court agrees with the Seventh Circuit that "a serious constitutional issue would be presented if Congress by stripping away the ministerial exception required federal courts to decide religious questions. The exception is based on the establishment and free-exercise clauses of the First Amendment . . . , which place tight limits on governmental authority to regulate religion." *Tomic*, 442 F.3d at 1042. Without the ministerial exception, for example, a Catholic Church's decision to restrict the priesthood to males or to only hire female nuns would be under attack by Title VII. *See Elvig*, 397 F.3d at 790–91.

Here, whether applied directly or through the RFRA, the ministerial exception guards against excessive entanglement and is a tool for analyzing the nature of the alleged burden on religious exercise. It is a judicially created doctrine relevant to whether a religious organization's hiring decisions regarding a particular individual should be insulated based on First Amendment concerns. Applying the ministerial exception strikes a proper balance between the important aims of Title VII

in eliminating discrimination, on the one hand, and safeguarding "matters of church government as well as those of faith and doctrine," *see Kedroff*, 344 U.S. at 116, on the other hand. For the RFRA analysis in particular, the ministerial exception is necessary for a case-specific application of the compelling interest test and is the kind of judicially crafted exception envisioned by the Court in *O Centro Espírita*. *See* 126 S. Ct. at 1222.

### Analysis Under the "Ministerial Exception"

The court's next step is thus to analyze the relationship between defendant and plaintiff through the ministerial exception. In applying the "ministerial exception" to employees other than ministers and clergy, "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.'" *Rayburn*, 772 F.2d at 1169 (quoting B. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 Colum. L. Rev. 1514, 1545 (1979)).

The court concludes that the ministerial exception does not apply in the case at bar, as plaintiff's teaching duties were primarily secular; those religious in nature were limited to only one hour of Bible instruction per day and attending religious ceremonies with students only once per year. *Cf. Musante v. Notre Dame of Easton Church*, No. Civ.A. 301CV2352, 2004 WL 721774, at *2, *8–9 (D. Conn. Mar. 30, 2004) (pastoral assistant who read scripture and distributed Communion during daily Mass, trained eucharistic ministers and readers, supervised the Lay Caring Ministry, and visited hospitals and homebound parishioners qualified under the ministerial exception).

Defendant urges the court to rely on *Clapper v. Chesapeake Conference of Seventh-day*

*Adventists*, an unpublished decision of the Fourth Circuit, where the court found the age and race discrimination claims of an elementary school teacher at a Seventh-day Adventist school barred by the Free Exercise Clause because of the religious nature of the teacher's duties. No. 97-2648, 1998 WL 904528 (4th Cir. Dec. 29, 1998) (unpublished opinion). In the Fourth Circuit, citation of unpublished opinions is "disfavored." 4th Cir. R. 36(c). Even taking *Clapper* under consideration, however, does not alter the court's finding that plaintiff is not a ministerial employee. First, the mere fact that *Clapper* involved a teacher at a Seventh-day Adventist school does not compel an identical result in this case. The inquiry into whether an employee should be considered clergy is fact-specific. In *Clapper*, there was considerable evidence that the plaintiff teacher's duties and relationship with the church employer were grounded in religion.

> Throughout his teaching career at Mt. Aetna Academy, Clapper led his students in prayer in the morning, at lunch, at the end of the school day, and at any time throughout the day if a student made a special request for prayer. He also conducted worship each day with his students for approximately ten minutes. Furthermore, on a daily basis he taught Bible as a formal part of the school curriculum and Seventh-day Adventist theology when incorporated into the traditional academic curriculum [including history and social studies]. Moreover, as required by the Education Code, Clapper engaged his students in the practice of witnessing, which encourages them to apply their faith in a practical way.

> In accord with the Education Code, while Clapper taught at Mt. Aetna Academy, he was an active, tithe-paying member of the Seventh-day Adventist Church. On January 20, 1991, the Chesapeake Conference awarded Clapper a Commissioned Ministry of Teaching Credential. Furthermore, thirty percent of Clapper's salary came from Seventh-day Adventist Church tithes.

*Clapper*, 1998 WL 904528, at *3. In the instant case, the only facts on the record regarding the religious nature of plaintiff's teaching duties are that she taught one hour of Bible study per day and attended religious ceremonies with students once per year. There are no records of tithe paying or that plaintiff involved Seventh-day Adventist teachings when she taught secular subjects, which took

up the bulk of her day. On such facts, the concerns over excessive entanglement that the courts confronted in *Clapper* or *Musante* are not present here.

The ministerial exception is inapplicable to plaintiff, and there is a compelling interest in ensuring that Title VII remains enforceable as to employment relationships that do not implicate concerns under the Free Exercise and Establishment Clauses of the First Amendment. The analysis the court has performed to eliminate excessive entanglement concerns ensures that the Title VII framework is the least restrictive means of furthering this compelling interest. Title VII as applied in this case qualifies as an exception to the RFRA under subsection (b), and defendant may not invoke the RFRA as a defense. There is subject matter jurisdiction for evaluating plaintiff's claims of gender and pregnancy discrimination, which the court shall proceed to address.

## IV.    Title VII / Pregnancy Discrimination

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act amended Title VII in 1978 and provides: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . ." *Id.* § 2000e(k).

For disparate treatment claims under Title VII, the plaintiff must first establish a prima facie case by showing that he or she (1) is a member of a protected class, (2) was qualified for the position

in question, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). The prima facie case "raises an inference of discrimination" that the employer must rebut. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 528, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Thus, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the employer meets this burden, the presumption of discrimination set by the prima facie case is dropped. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 & n.10, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). In the last stage, the burden of production shifts back to the employee to show that the reasons given by the employer are a pretext for discrimination. *E.g.*, *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804; *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170 (2d Cir. 1993). Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

Here, there is no dispute between the parties that plaintiff, as a pregnant woman, is a member of a protected class, that she was qualified for the teaching position at the Linden School, and that she suffered an adverse employment action by being terminated. In establishing that defendant terminated her upon being notified of her pregnancy, plaintiff also provides sufficient evidence giving rise to an inference of pregnancy discrimination. Plaintiff has thus put forth a prima facie case. Defendant counters that plaintiff was not terminated because of her pregnancy but because of her failure to abide by the Seventh-day Adventist Church doctrine that fornication is a "grievous

sin." Defendant insists that it acted in accord with the AUCEC, which instructs that an employee may be terminated for "[i]mmoral or unsatisfactory personal conduct inconsistent with the principles of the Seventh-day Adventist Church."

Where the employer has articulated a religious reason for the allegedly discriminatory adverse employment action, the plaintiff "may not challenge the plausibility of putative religious purposes. A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held." *DeMarco*, 4 F.3d at 171. The focus of the court's inquiry should thus be on pretext, including "factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." *Id.*

In cases where religious school employers have asserted fornication as a reason for terminating a pregnant unmarried woman, courts have held that an employer enforcing such a policy unevenly—e.g., only against women or only by observing or having knowledge of a woman's pregnancy—is evidence of pretext. *See, e.g.*, *Cline*, 206 F.3d at 667; *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 344, 349 (E.D.N.Y. 1998). "This is because a school violates Title VII if, due purely to the fact that '[w]omen can become pregnant [and][m]en cannot,' it punishes only women for sexual relations because those relations are revealed through pregnancy." *Cline*, 206 F.3d at 667 (quoting *Ganzy*, 995 F. Supp. at 344) (citation omitted). Thus, while a religious school employer may validly seek to impose moral doctrine upon its teaching staff, punishment singularly directed at the Hester Prynnes, without regard to the Arthur Dimmesdales, is not permissible. *See* NATHANIEL HAWTHORNE, THE SCARLET LETTER (1850); *see also Ganzy*, 995 F. Supp. at 351 (citing

*The Scarlet Letter* and noting that "[p]artly because women become pregnant, directly evidencing their sexual activity, they have been more frequently subject to such condemnation than men").

As in *Ganzy*, defendant has not provided any evidence that any other teacher has been terminated from the Linden School for engaging in sexual relations outside of marriage. Knowledge of other teachers engaging in extramarital sexual relations, as reported by plaintiff, cannot be imputed to the defendant. But defendant fails to explain how it has enforced a policy against such behavior, if it exists, to both males and females. Moreover, defendant admits to considering plaintiff's pregnancy as "evidence of fornication." (*See* Barnes Decl. ¶ 14.) Plaintiff suggests that, had the Linden School's primary concern been to enforce a policy against extramarital sexual relations, the School would have terminated her immediately instead of waiting approximately two months. Defendant claims that any delay was the result of the Linden School following appropriate termination procedures. Nevertheless, the issues raised by plaintiff, alongside comments that plaintiff should conceal her stomach, at least raise a question of fact regarding whether defendant's policy is applied in a discriminatory fashion and whether plaintiff was terminated because of her sex and pregnancy, as prohibited by Title VII.

Though the parties expend much effort in debating whether plaintiff knew about defendant's policy against extramarital sexual relations and whether the employment contracts plaintiff signed legitimize her termination, these disputes are not relevant in deciding plaintiff's claim under Title VII. "[T]here can be no prospective waiver of an employee's rights under Title VII. . . . Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974). Thus, "employment contracts, no matter what the circumstances that justify

their execution or what the terms, may not be used to waive protections granted to an individual under [Title VII] or any other [A]ct of Congress." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 117 (2d Cir. 2000) (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C. Cir. 1979)).

There is a genuine issue as to a material fact—whether defendant terminated plaintiff because of her sex and pregnancy or because of an evenly applied religious and moral code. Therefore, defendant's motion for summary judgment on plaintiff's Title VII claim is denied.

**V .    New York Human Rights Law**

"[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997). The RFRA is unconstitutional as applied to state law, however, and should thus be excluded in the analysis of plaintiff's state discrimination claim. *See Boerne*, 521 U.S. at 519. Nevertheless, common law analysis, including under the ministerial exception, is relevant. The court has already evaluated the applicable common law principles in denying summary judgment as to plaintiff's Title VII claim. Thus, at this stage, summary judgment is also denied as to plaintiff's claim under the New York State Human Rights Law.

**VI.    Family Medical Leave Act**

The Family Medical Leave Act ("FMLA") entitles eligible employees to twelve weeks of leave during a twelve-month period because of the birth of a child. 29 U.S.C. § 2612(a)(1)(A). Eligible employees who take leave under the FMLA have a right "(A) to be restored by the employer

to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id*. § 2614(a). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. *Id*. § 2615(a)(1).

The defendant does not address plaintiff's FMLA claim in its motion papers but moves for summary judgment as to the entire complaint. The court is unable to assess the merits of plaintiff's FMLA claim because she has not pled the FMLA claim with sufficient specificity in her complaint. *See Vicioso v. Pisa Bros.*, No. 98 Civ. 2027, 1998 WL 355415, at * 1–4 (S.D.N.Y. 1998). Even though plaintiff worked at the Linden School for three school years, plaintiff did not allege that she worked "at least 1,250 hours of service with such employer during the previous 12-month period" as required under 29 U.S.C. § 2611(2)(A). Nor has plaintiff pled that defendant qualifies under the FMLA's definition of "employer" or even indicated that the relief sought is interference with FMLA rights under § 2615(a)(1) or another theory. The only mention of or connection to the FMLA in plaintiff's complaint is that the action is "based upon the Defendant's violation of" it.

The court dismisses plaintiff's FMLA claim but, in the interest of justice, under Fed. R. Civ. P. 15(a), grants plaintiff leave to replead the FMLA claim within twenty days of this decision, i.e., by August 15, 2006.


VII.    **Conclusion**

For the reasons set forth above, defendant's motion for summary judgment is denied as to plaintiff's Title VII / Pregnancy Discrimination Act and New York Human Rights Law claims. The

court dismisses plaintiff's FMLA claim without prejudice to replead this claim within twenty days,

i.e., by August 15, 2006.

SO ORDERED.

DATED:     Brooklyn, New York
           July 26, 2006

                         _____/s/_____
                              DORA L. IRIZARRY
                           United States District Judge