UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
Jewel Redhead,                                  :
                                                :
                      Plaintiff,                :            **OPINION AND ORDER**
                                                :
          -against-                             :            03-CV-6187 (DLI) (AKT)
                                                :
Conference of Seventh-day Adventists,           :
                                                :
                      Defendant.                :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

In this lawsuit, plaintiff Jewel Redhead alleges that defendant Conference of Seventh-day

Adventists unlawfully discriminated against her when it terminated her from a teaching position

at the Linden Seventh-day Adventists School (the "Linden School") for being pregnant and

unmarried. Plaintiff claims violations of Title VII of the Civil Rights Act of 1964 ("Title VII"),

as amended by the Pregnancy Discrimination Act of 1978, and the New York State Human

Rights Law. At the close of discovery, defendant moved for summary judgment, arguing that the

court lacked jurisdiction to consider plaintiff's claim because of the "ministerial exception" to

Title VII, and that in any event, plaintiff was lawfully terminated for violating church doctrine.

In a decision dated July 26, 2006, the court denied summary judgment on plaintiff's

discrimination claims, finding that the ministerial exception did not apply to plaintiff and that a

genuine issue of material fact existed as to whether defendant fired plaintiff because she violated

the school's religious code, or whether defendant singled plaintiff out for termination because of

her gender and pregnancy. *See Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp.

2d 211 (E.D.N.Y. 2006).

On March 21, 2008, as the parties were preparing for trial, the United States Court of Appeals for the Second Circuit issued its decision in *Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008), discussing, among other things, the ministerial exception and the extent to which courts in Title VII cases can scrutinize an employment action that a religious employer claims was made for a religious reason. At a pre-trial conference held on April 2, 2008, the court granted defendant's request to adjourn the trial *sine die* so that the court could reconsider its denial of summary judgment in light of the Second Circuit's decision in *Cote*. After allowing the parties an opportunity to brief the issue, the court held a conference on June 11, 2008, at which it informed the parties that defendant's renewed application for summary judgment was denied, and that the trial would proceed as scheduled. The reasoning behind that decision is set forth below.

I.      **Background**[1]

    A.      The July 26, 2006 Summary Judgment Decision

In denying defendant's motion for summary judgment, the court ruled that: (1) neither the First Amendment, the ministerial exception, nor the Religious Freedom Restoration Act ("RFRA"), prevented the court from considering the merits of plaintiff's claim, and (2) plaintiff had raised a genuine issue of material fact as to whether defendant's asserted reason for terminating plaintiff was merely a pretext for discrimination. *Redhead*, 440 F. Supp. 2d at 224.

Addressing the first issue, the court noted that the Second Circuit had yet to either explicitly reject or adopt the "ministerial exception"—a judicially created doctrine that, in certain circumstances, shields religious institutions from liability under employment statutes such as

---

[1] Familiarity with the background of this case is assumed. The court previously set forth the underlying facts in its July 26, 2006 Memorandum and Order, *see Redhead*, 440 F. Supp. 2d 211, and they will not be reiterated herein except as needed for discussion of the instant motion.

Title VII and the Age Discrimination in Employment Act of 1967 ("ADEA")—but that recently, in *Hankins v. Lyght*, a Second Circuit panel had declined to apply the doctrine in favor of a statutory interpretation under the RFRA.[2]  *Id*. at 218-19 (citing *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006)).  After voicing doubts about the RFRA's applicability to suits between private parties, the court, "constrained to follow *Hankins*," nevertheless applied the RFRA to plaintiff's claim.  *Id*. at 219.  In so doing, the court accepted defendant's argument "that the application of Title VII would (1) substantially burden its (2) sincere (3) religious exercise of ensuring that teachers at the Linden School follow the teachings of the Seventh-day Adventist Church," but noted "that, generally, Title VII's purpose of eradicating employment discrimination is a 'compelling government interest.'"  *Id*. at 219-20 (citations omitted).  Relying on the Supreme Court's decision in *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, which held that the RFRA is amenable to "*judicially crafted* exceptions," the court incorporated its analysis of the ministerial exception into the RFRA framework in order to ensure that application of Title VII would be the "least restrictive means" of furthering the government's compelling interest in eradicating workplace discrimination.  *Id*. at 220-22 (citing *Gonzales*, 546 U.S. 418, 434 (2006)).

After considering the factual record, the court held that the primarily secular nature of plaintiff's duties rendered the ministerial exception inapplicable to her, and that, as such, Title VII, as applied to plaintiff, qualified as an exception to the RFRA.  *Id*. at 221-22.  Finding that consideration of the ministerial exception effectively allayed the concerns that the religion clauses of the First Amendment were designed to prevent, the court turned to the merits of plaintiff's discrimination claim.  *Id*. at 222.

---

[2] The RFRA provides, in relevant part, that the government may "substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.

Analyzing plaintiff's claim under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court determined that plaintiff: (1) was, as a pregnant woman, a member of a protected class, (2) was qualified to teach at the Linden School, (3) suffered an adverse employment action when she was terminated, and (4) had put forth sufficient evidence to raise an inference of illegal discrimination by establishing that defendant had terminated her after being notified of her pregnancy. *Id.* at 222. The court found, however, that defendant had rebutted the inference of discrimination by articulating a legitimate non-discriminatory reason for plaintiff's termination, namely, that plaintiff was fired because she failed to abide by the Seventh-day Adventist Church doctrine proscribing fornication a "grievous sin," commission of which subjected Linden School employees to termination. *Id.* at 222-23. After considering the evidentiary record and finding that a genuine issue of material fact existed as to "whether defendant terminated plaintiff because of her sex and pregnancy or because of an evenly applied religious and moral code," the court denied summary judgment on plaintiff's discrimination claim.[3] *Id.* at 224.

B.    The Second Circuit's Decision in *Cote*

In *Cote*, the Second Circuit considered the appeal of Father Justinian Rweyemamu, an African-American Catholic priest who brought a Title VII racial discrimination lawsuit against his former Diocese and its Bishop, "[a]lleging that [they] . . . misapplied canon law in denying him a requested promotion and, ultimately, in terminating him." *Cote*, 520 F.3d at 199-200. The district court had found Father Justinian's claim barred by the ministerial exception and had dismissed it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id.* at 200. On

---

[3] The court denied summary judgment on plaintiff's discrimination claim under Title VII and her claim under New York State's Human Rights Law. "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997). As such, for the sake of simplicity, this decision refers only to plaintiff's claim under Title VII.

appeal, the Second Circuit first considered the *Hankins* court's analysis of the RFRA, but found it inapplicable as the defendants in *Cote* had explicitly waived any rights they had under that statute.[4] *Id*. at 203-05. The court then went on to discuss the history of the ministerial exception in general, *id*. at 204-07, and its application in the Second Circuit in particular, *id*. at 207-09.

In examining how various federal courts across the country have applied the ministerial exception, the Second Circuit noted that "[s]ome courts have stressed the right to church autonomy secured by the Free Exercise Clause," while "[o]thers have emphasized that taking sides in a religious dispute would lead an Article III court into excessive entanglement in violation of the Establishment Clause," while still others "have explained that '[t]he right to choose ministers without government restriction underlies the well-being of religious communit[ies].'" *Id*. at 205 (citations omitted). Drawing some general conclusions from this body of federal case law, the court observed that the doctrine is well-entrenched, encompasses more than just clergy, is not unique to any one religion, and "although its name might imply an absolute exception, it is not always a complete barrier to suit; for example, a case may proceed if it involves a limited inquiry that, 'combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.'" *Id*. at 206-07 (quoting *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999)).

Turning to the application of the ministerial exception within the Second Circuit, the court reviewed its earlier decisions in *Catholic High School Ass'n of the Archdiocese v. Culvert*, 753 F.2d 1161 (2d Cir. 1985), and *DeMarco v. Holy Cross High School*, 4 F.3d 166 (1993), and concluded that this limited precedent supported:

---

[4] The panel in *Cote* also criticized the *Hankins* court's application of the RFRA to a suit between private parties, but ultimately found "no need . . . to wrestle with RFRA's applicability because the defendants in this case, unlike in *Hankins*, have waived a RFRA defense." 520 F.3d at 203 n.2, 204.

> [T]he following propositions: (1) Title VII and the ADEA are not inapplicable to religious organizations as a general matter; (2) we will permit lay employees-but perhaps not religious employees-to bring discrimination suits against their religious employers; and (3) even when we permit suits by lay employees, we will not subject to examination the genuineness of a proffered religious reason for an employment action.

*Cote*, 520 F.3d at 207. The court continued, "Presented with this occasion to formally adopt the ministerial exception, we affirm the vitality of that doctrine in the Second Circuit. In our view, the ministerial exception is constitutionally required by various doctrinal underpinnings of the First Amendment." *Id.* The court then explained that, in applying the ministerial exception, the religion clauses of the First Amendment require courts to look both to the "'function' of an employee, rather than his title or the fact of his ordination," and also to "the type of claim asserted." *Id.* at 208. Just as a certain "employee's relationship with his employer may be 'so pervasively religious' that judicial interference in the form of a discrimination inquiry may run afoul of the Constitution," *id.* (citing *DeMarco*, 4 F.3d at 72), the court noted, so too may certain types of claims "inexorably entangle [courts] in doctrinal disputes," *id.* (citing *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir. 1989)).

> Turning to the merits of the claim before it, the court stated:

> We need not attempt to delineate the boundaries of the ministerial exception here, as we find that Father Justinian's Title VII claim easily falls within them. Father Justinian is an ordained priest of the Roman Catholic Church; his duties are determined by Catholic doctrine and they are drawn into question in this case. Furthermore, in order to prevail on his Title VII claim, he must argue that the decision of the [religious authorities] was not only erroneous, but also pretextual. Such an argument cannot be heard by us without impermissible entanglement with religious doctrine. Because Title VII is unconstitutional as applied in this case, Father Justinian's federal claim fails at its inception.

*Id.* at 209 (citing *Petruska v. Gannon University*, 462 F.3d 294, 305 n.8 (3d Cir. 2006)). After discussing several cases from other circuits where discrimination claims brought by clergy members were found to be constitutionally proscribed, the court concluded that "based on the

facts of this case-in particular, the nature of Father Justinian's duties and the basis for his dismissal-that the ministerial exception bars Father Justinian's Title VII claim." *Id*. The court accordingly upheld the district court's dismissal of Father Justinian's lawsuit.

## III. Discussion

Defendant argues that *Cote* prevents this case from continuing to trial because it: (1) broadly defined the ministerial exception to cover the discrimination claims of employees such as plaintiff, and (2) held that Title VII plaintiffs cannot challenge as "pretextual" under *McDonnell Douglas* a religious employer's decision to discharge an employee if the employer justifies that decision on religious grounds.[5] Although the court agrees that *Cote* clarified the ministerial exception, and demonstrated that the exception applies to plaintiff in the sense that it prevents her from questioning the validity of defendant's religious code, the court does not read *Cote* to prevent plaintiff from attempting to prove that the code was applied to her in a discriminatory manner. Likewise, while certain statements in *Cote* can be read to foreclose a ministerial employee from ever being able to challenge his employer's stated religious motive for a discharge under *McDonnell Douglas*, nothing in that decision, nor in the cases that preceded it, supports extending a similarly absolute prohibition to secular employees such as plaintiff.

---

[5] In the original summary judgment opinion , the court, "constrained to follow *Hankins*," evaluated plaintiff's claim under the RFRA, despite defendant never having raised a RFRA defense. *See Redhead*, 440 F. Supp. 2d at 219 (citing *Hankins*, 411 F.3d 96). In its briefs filed in support of the present motion, defendant again makes no mention of a RFRA defense, despite being aware of the *Hankins* decision, as well as this court's lengthy discussion of the RFRA in the original summary judgment opinion. Accordingly, the court considers this defense waived. *See Cote*, 520 F.3d at 204; *Rojas v. Roman Catholic Diocese of Rochester*, No. 07-CV-6250, 2008 WL 2097505 at *8 (W.D.N.Y. May 19, 2008). In any event, the court's analysis of the ministerial exception would remain unchanged regardless of whether it is applied independently, or as a "*judicially crafted* exception" to the RFRA. *See Hankins v. The New York Annual Conference of the United Methodist Church*, 516 F. Supp. 2d 225, 237-38 (E.D.N.Y. 2007); *Redhead*, 440 F. Supp. 2d at 220 (citing *O Centro Espírita*, 546 U.S. at 434).

*Cote* did not provide the Second Circuit an opportunity to define the ministerial exception's outer limits, as Father Justinian's claim fell comfortably within its boundaries, but the opinion did hold that the exception "is constitutionally required by various doctrinal underpinnings of the First Amendment," particularly the doctrines that have grown out of the Free Exercise Clause and the Establishment Clause.  *See Cote*, 520 F.3d at 207-09.  When this court discussed the ministerial exception in its summary judgment opinion, without having the benefit of *Cote*'s guidance, it focused on whether plaintiff's "primary duties" consisted of teaching, supervising, or participating in religious activity.  *See Redhead*, 440 F. Supp. 2d at 220-22; *see also EEOC v. Catholic University of America*, 83 F.3d 455, 461 (D.C. Cir. 1996) (noting that the ministerial exception applies to "lay employees of religious institutions whose 'primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship'") (quoting *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)).  Because the court found that plaintiff's duties at the Linden School were "primarily secular," it held that the ministerial exception did not foreclose her lawsuit.  *Redhead*, 440 F. Supp. 2d at 221.

This "primary duties" inquiry is concerned principally with whether allowing certain employees' claims would burden a religious employer's rights under the Free Exercise Clause. *See Petruska*, 462 F.3d at 307; *Catholic University*, 83 F.3d at 461; *Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200, 211 (D. Conn. 2000) ("It is only when the Court concludes that the employee had primarily religious duties and responsibilities that the employment decision made by the religiously-affiliated institution is barred from review by the Free Exercise Clause."). While *Cote* confirmed the propriety of this type of inquiry, it also found it "too rigid as it fails to consider the nature of the dispute."  520 F.3d at 208.  Thus, an examination not just of plaintiff's

function is required, but also of the nature of plaintiff's claim, and specifically, whether allowing plaintiff to litigate that claim will violate the Establishment Clause. *See id.* The court sees no basis to depart from its earlier finding—made at the summary judgment stage on the basis of a full evidentiary record—that plaintiff's "function" as a teacher at the Linden School was primarily secular, and that, as such, allowing her lawsuit to go forward will not impermissibly burden defendant's rights under the Free Exercise Clause. Nevertheless, the court shall, in light of *Cote*, examine whether the nature of the dispute in this case is such that its resolution inevitably will run afoul of the Establishment Clause by impermissibly entangling the court in matters of religious doctrine.

A.    "Excessive Entanglement" under the Establishment Clause

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion . . ." U.S. Const. amend. I. The Supreme Court has interpreted that clause to extend to both legislative and judicial action, *Petruska*, 462 F.3d at 306 (citing *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191 (1960)), and to prohibit, among other things, "excessive government entanglement with religion," *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971).[6] "Entanglement may be substantive-where the government is placed in the position of deciding between competing religious views-or procedural-where the state and church are pitted against one another in a protracted legal battle." *Cote*, 520 F.3d at 208 (quoting *Petruska*, 462 F.3d at 311). In other words, courts should consider both "the substance and effect" of a lawsuit

---

[6] In *Lemon v. Kurtzman*, the Supreme Court held that in order for a statute to pass muster under the Establishment Clause, it "must have a secular legislative purpose[,] . . . its principal or primary effect must be one that neither advances nor inhibits religion, . . . [and it] must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612-613 (citations omitted). Although the *Lemon* test has drawn considerable criticism, *see, e.g.*, *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 397-401 (1993) (Scalia, J., concurring), it remains the primary framework for determining Establishment Clause violations, s*ee McCreary County v. American Civil Liberties Union*, 545 U.S. 844 (2005). In the instant case, it is undisputed that Title VII has a secular legislative purpose and a primary effect that neither advances nor inhibits religion, thus, only the "entanglement" prong is at issue.

in order to determine whether its resolution will cause excessive government entanglement with religion. *Natal*, 878 F.2d at 1577; *accord*, *Cote*, 520 F.3d at 208-09.

In the context of a Title VII suit, the threat of substantive entanglement is greatest in situations like that involved in *Cote*, where a secular court is asked to second-guess a religious organization's decision to terminate a member of its clergy. *See Bollard*, 196 F.3d at 948-49 (citing *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356-57 (D.C. Cir. 1990)). In contrast, employment disputes that a court can decide without having to question the validity or plausibility of a religious belief, or having to favor a certain interpretation of religious doctrine, do not pose a similar risk. *See Hartwig*, 93 F. Supp. 2d at 212-13 (citing *Geary v. Visitation of the Blessed Virgin Mary Parish School*, 7 F.3d 324, 327 (3d Cir. 1993); *DeMarco*, 4 F.3d at 171; *Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360, 363 (8th Cir. 1991); *Minker*, 894 F.2d at 1356-57).

Procedural entanglement is closely linked to substantive entanglement, and where the danger of substantive entanglement is absent, "procedural entanglement considerations are reduced to the constitutional propriety of subjecting a church to the expense and indignity of the civil legal process." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 957 (9th Cir. 2004) (citing *Bollard*, 196 F.3d at 949). The Second Circuit has held that application of the *McDonnell Douglas* test to a discrimination claim brought by a lay employee against a religious employer, without more, generally does not run the risk of excessive entanglement, as such an inquiry constitutes only the sort of "routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies." *DeMarco*, 4 F.3d at 170 (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 696-97 (1989)); *see also Culvert*, 753 F.2d

at 1167 (noting "that although application of Title VII . . . to lay teachers at a religious college would often involve a 'wide ranging investigation into many aspects of the College's hiring practices,' such supervision did not constitute 'ongoing interference with the College's religious practices'" in violation of the Establishment Clause) (quoting *EEOC v. Mississippi College*, 626 F.2d 477, 487-88 (5th Cir. 1980)).  Nevertheless, *Cote* raises questions about whether courts in this circuit, in resolving Title VII and related claims, can constitutionally apply the final step of the *McDonnell Douglas* test—the so-called "pretext" inquiry—when, as in this case, a religious justification is offered in defense of a challenged employment action.  An analysis of what this inquiry usually entails is helpful in determining whether *Cote* forecloses such an inquiry in the present case.

B.      The *McDonnell Douglas* Pretext Inquiry

Under the *McDonnell Douglas* framework, after a plaintiff has put forward the necessary facts to raise an inference of employment discrimination and the defendant has rebutted that inference by offering a legitimate reason for why the adverse employment action was taken, the burden shifts back to the plaintiff to demonstrate that the defendant's stated reason for taking the adverse employment action "was in fact pretext," *McDonnell Douglas Corp.*, 411 U.S. at 804; *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981), "although it is probably less confusing to merely say that the plaintiff must then prove a discriminatory dismissal," *Ganzy v. Allen Christian School*, 995 F. Supp. 340, 349 (E.D.N.Y. 1998).  As another court in this district helpfully explained in a case with facts very similar to this one, a variety of evidence may help determine this issue:

> [R]elevant to the issue of pretext is misjudgment of an employee's qualifications; data suggesting that a termination was part of a general pattern of discrimination; deviation from the employer's normal employment policies; non-discriminatory justification stated only after the allegation of discrimination is made; or evidence

that the employer knew of flouting of the questionable policy by those of the opposite gender but ignored the violations.

*Id*. at 349-350 (citing *McDonnell Douglas*, 411 U.S. at 805; *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996); *Boyd v. Harding Academy of Memphis*, 88 F.3d 410, 414 (6th Cir. 1996); *DeMarco*, 4 F.3d at 171; *Dister v. Continental Group,* 859 F.2d 1108, 1116 (2d Cir. 1988)). When a Title VII case is brought against a religious organization, however, the evidence that may be considered at this stage is circumscribed in that neither the court, nor the jury, may question the sincerity of a defendant's belief in a proffered religious justification. *Cote*, 520 F.3d at 207 ("[W]e will not subject to examination the genuineness of a proffered religious reason for an employment action."); *DeMarco*, 4 F.3d at 171 ("A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held."); *Ganzy*, 995 F. Supp. at 350 ("Evaluation of the religious merits underlying the proffered doctrinal reason is not an acceptable manner of determining pretext because it would violate both the First Amendment and Title VII."). Nevertheless, an employer's simple assertion of a religious motive usually will not prevent a reviewing court from asking whether that motive "was in fact pretext" within the meaning of *McDonnell Douglas*; answering this question is only foreclosed where it would force the fact-finder to make a subjective judgment about a religious belief. *See DeMarco*, 4 F.3d at 171 ("[A] plaintiff will usually be able to challenge as pretextual the employer's justification without calling into question the value or truthfulness of religious doctrine."); *Geary*, 7 F.3d at 330 ("Thus, when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious visions, that inquiry does not present a significant risk of entanglement"); *Ganzy*, 995 F. Supp. at 350 ("[I]t remains fundamental that religious motives may not be a mask for sex discrimination in the workplace.").

C.     *Cote*'s Discussion of "Pretext"

In *Cote*, the Second Circuit refused to consider Father Justinian's claim that his church's decision to terminate him "was not only erroneous, but also pretextual," because it concluded that "[s]uch an argument cannot be heard . . . without impermissible entanglement with religious doctrine."  520 F.3d at 209.  Defendant invites the court to broadly interpret this statement to mean that whenever "there is an argument that the religious reasons for a discharge are pretextual," as there is in this case, excessive entanglement is inevitable and application of Title VII is unconstitutional.  (Pl. Mem. 10-11.)  The court declines this invitation because defendant's proposed interpretation would be at variance both with *Cote* itself and with the pre-existing precedent within this circuit upon which *Cote* relied.

The Second Circuit was very careful to limit its holding in *Cote* to the facts before it, and to avoid creating a large exemption from Title VII for religious employers.  The opening sentence of the opinion notes that Father Justinian's principal allegation was that his Diocese had "*misapplied canon law* in denying him a requested promotion and, ultimately, in terminating him," *Cote*, 520 F.3d at 199 (emphasis added), and the last substantive paragraph of the opinion explicitly bases the application of the ministerial exception "on the facts of this case-*in particular the nature of Father Justinian's duties and the basis for his dismissal*," *id*. at 209 (emphasis added).  Additionally, after surveying decisions from other jurisdictions that had applied the ministerial exception, the court noted that, even where the exception applies to a particular claim, "it is not always a complete barrier to suit," so long as the remaining issues in the case can be determined without impermissibly intruding into sensitive religious matters.  *Id*. at 207 (quoting *Bollard*, 196 F.3d at 950).  Finally, in support of its conclusion that Father Justinian's claim should be dismissed at its inception because "Title VII is unconstitutional as

applied" to his case, the court cited to a footnote from the decision of the United States Court of Appeals for the Third Circuit in *Petruska v. Gannon University*. *Id*. at 209 (citing *Petruska*, 462 F.3d at 305 n. 8). That footnote, which discusses the Supreme Court's decision in *Ayotte v. Planned Parenthood of Northern New England*, is devoted entirely to explaining why "a *narrow exception* to prevent the unconstitutional enforcement of Title VII is the proper remedy." *Petruska*, 462 F.3d at 305 n. 8 (citing *Ayotte*, 546 U.S. 305 (2006)) (emphasis added). Given these aspects of *Cote*, it seems unlikely that the Second Circuit intended to endorse the broad categorical rule that defendant suggests.

Moreover, the court in *Cote* did not purport to change the law of the circuit, rather, it merely "affirm[ed] the vitality" of the ministerial exception within the circuit after reviewing two of its prior decisions—*Culvert* and *DeMarco*—which had discussed the extent to which the First Amendment protects the employment decisions of religious employers. An examination of those cases reveals a rule consistent with what this court held in its original summary judgment decision—that, although the validity of defendant's religious code may not be impugned, the allegedly discriminatory application of such a code to lay employees is a proper subject of judicial scrutiny.

In *Culvert*, the Second Circuit held that it would not violate the First Amendment for the New York State Labor Relations Board ("the State Board") to exercise jurisdiction over labor relations between parochial schools and their lay teachers. 753 F.2d 1161. The court, however, did limit what the State Board could consider, stating that when it came to a teacher's allegation of unlawful discharge, "the First Amendment prohibits the State Board from inquiring into an asserted religious motive to determine whether it is pretextual." *Id*. at 1168. This prohibition of "pretextual" challenges, however, referred to the "recurrent questioning of whether a particular

church actually holds a particular belief," and should not be read to prohibit all lines of inquiry that might arise from a pretext analysis under *McDonnell Douglas*. *See id*. Importantly for present purposes, *Culvert* notes that plaintiffs, by demonstrating that other employees had engaged in the same misconduct without consequence, may still attempt to prove that a defendant's asserted religious reason was not the actual motivating cause for a discharge. *Id*. (citing *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983)). Ultimately, the court held that the State Board could protect teachers at parochial schools from unlawful discharge—consistent with the First Amendment—by finding a violation only in those cases where the unlawful motivation actually caused the discharge, i.e., where the teacher would not have been discharged "but for" the unlawful motivation. *Id*. at 1169.

In *DeMarco*, the Second Circuit held that the ADEA could constitutionally be applied to a lay teacher's claim against a parochial school, even though the school claimed that it discharged the plaintiff for failing to fulfill his religious duties. 4 F.3d 166. Rejecting the district court's conclusion that a pretext inquiry under *McDonnell Douglas* would involve "recurrent inquiry as to the value or truthfulness of church doctrine," the Second Circuit explained that when undertaking such an inquiry, "a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable." *Id*. at 170-71. Instead, the court noted, the inquiry is normally directed at determining whether the defendant's stated purpose was the actual purpose for the challenged employment action, and "focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." *Id*. at 171 (citations omitted). The court held that although the

Establishment Clause required fact-finders "to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held," plaintiffs in Title VII and ADEA suits normally could challenge a religious organization's proffered justification under the final step of the *McDonnell Douglas* test "without calling into question the value or truthfulness of religious doctrine." *Id*.

The court distinguished the case before it from those involving clergy members, but noted that even with lay employees, certain cases may involve an employee-employer relationship that "is so pervasively religious" that a discrimination claim cannot be considered without seriously risking a violation of the Establishment Clause. *Id*. at 172. Finding that the employment relationship at issue posed no such risk, and expressing confidence in the ability of the district court "to focus the trial upon whether [the plaintiff] was fired because of his age or because of failure to perform religious duties," the Second Circuit reversed the district court, and allowed the plaintiff's claim to continue towards trial. *Id*. at 172-73.

As noted above, the court in *Cote* affirmed the existence of the ministerial exception within the Second Circuit based on principles gleaned from *Culvert* and *DeMarco*. 520 F.3d at 207. Nothing in these principles, nor in this court's independent reading of *Cote*, *Culvert*, and *DeMarco*, leads the court to believe that it may not allow a jury to determine, under the final step of the *McDonnell Douglas* test, whether a religious employer discriminated against a lay employee on account of "sex and pregnancy or because of an evenly applied religious and moral code." *See Redhead*, 440 F. Supp. 2d at 224. Both *Culvert* and *DeMarco* approved this type of "dual motive analysis" so long as the validity or truthfulness of religious doctrine is not questioned, *see, e.g.*, *Culvert*, 753 F.2d at 1168, and the Second Circuit in *Cote* did not purport to expand the ministerial exception beyond what it and other courts previously had interpreted the

First Amendment to require.  Accordingly, allowing a secular employee to challenge an adverse employment action that a defendant claims is religiously motivated is consistent both with *Cote* and with the Second Circuit's prior holdings.  *See also Martinelli v. Bridgeport Roman Catholic Diocese Corp.*, 196 F.3d 409, 431-32 (2d Cir. 1999); *Gargano v. Diocese of Rockville Centre*, 80 F.3d 87, 90 (2d Cir. 1996).

D.     Application of *Cote* to Plaintiff's Lawsuit

Plaintiff has provided enough evidence to create a genuine issue of material fact as to whether defendant's policy against fornication was applied against her in a discriminatory manner.  *See Redhead*, 440 F. Supp. 2d at 211.  And although *Cote* reaffirms that plaintiff must concede both the existence of defendant's policy and the genuineness of defendant's belief in that policy, a jury remains the proper instrument for determining "whether it was pregnancy or fornication that caused the Defendant to dismiss the Plaintiff."  *Ganzy*, 995 F. Supp. at 360.  As one commentator recently explained after examining the facts of this case and others involving similar situations, such a determination will not violate the Establishment Clause by causing excessive government entanglement with religion because:

> No one questions the school's religious belief that sex outside marriage is forbidden.  The court need not evaluate the plaintiff's spirituality because no one disputes that she engaged in forbidden conduct.  The only question to be decided falls well within the competence of the courts:  determining whether the plaintiff's evidence established that men and women were treated the same on this issue.

Caroline Mala Corbin, *Above the Law?  The Constitutionality of the Ministerial Exemption from Antidiscrimination Law*, 75 Fordham L. Rev. 1965, 2017 (2007); *see also Dolter v. Wahlert High Sch.*, 483 F. Supp. 266, 270 (N.D. Iowa 1980) ("The only issues the court need decide are whether [the Catholic Church's] moral precepts . . . are applied *equally* to defendant's male and female teachers; and whether [plaintiff] was in fact discharged *only* because she was pregnant,

rather than because she obviously had pre-marital sexual intercourse in violation of defendant's moral code."). A number of courts have been called upon in the past to distinguish between a secular employee's lawful discharge for violating a religious policy against fornication and an unlawful discharge on account of pregnancy, and to the court's knowledge, none have found excessive entanglement inevitable. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000); *Boyd*, 88 F.3d 410; *Ganzy*, 995 F. Supp. 340; *Vigars v. Valley Christian Ctr.*, 805 F. Supp. 802 (N.D. Cal. 1992); *Dolter*, 483 F. Supp. 26; *see also* Corbin, *supra*, at 2016-17. Nothing about the present case convinces the court that an Establishment Clause violation is more likely to occur by allowing plaintiff to present her discrimination claim to a jury.

Had plaintiff's duties at the Linden School primarily been of a religious or spiritual nature, her discrimination claim might well be constitutionally proscribed. *See Geary*, 7 F.3d at 330 (noting that some courts have refused to allow even a limited pretext inquiry "when the employee who challenges an employment decision is a member of the clergy") (citing *Scharon*, 929 F.2d at 363; *see also Combs v. Central Texas Annual Conference of the United Methodist Church*, 173 F.3d 343 (5th Cir. 1999) (holding that a clergy member's pregnancy discrimination claim against her church was barred by the Free Exercise Clause). *Cf. Rojas*, 2008 WL 2097505 at *9 n.8 (interpreting *Cote* "to mean that, in this Circuit, the ministerial exception does not necessarily apply to claims involving the hiring or firing of a minister, unless the hiring or firing involves issues of religion"). The decision in *Cote* likely prevents a clergy member, such as Father Justinian, from ever being able to challenge as pretextual a discharge that his employer justifies on a religious ground. *See Cote*, 520 F.3d at 209. As explained in this court's original denial of summary judgment, however, plaintiff is not a clergy member and her duties at the Linden School were primarily secular. Thus, the dismissal of Father Justinian's "pretextual"

challenge does not foreclose her claim.  As a secular employee, plaintiff's discrimination lawsuit comports with the First Amendment so long as it will not cause excessive government entanglement with religion.  For the reasons discussed above, the court finds that it will not.  This analysis is all that the court reads *Cote* to require.

Finally, defendant also argues that its "expressive association rights" under the First Amendment, as defined by the Supreme Court in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), insulate its decision to terminate plaintiff from judicial review.  In *Cote*, the Second Circuit cited *Dale* when it noted that some courts have described the ministerial exception as a means to protect "the well-being of religious communities."  *See* 520 F.3d at 205 (citations omitted).  The Second Circuit's application of the ministerial exception to Father Justinian's claim, however, was grounded in the Free Exercise and Establishment Clauses.  *See id.* at 208-09.  Moreover, defendant's right of expressive association could only exempt it from application of Title VII if defendant were claiming a right to engage in the alleged unlawful discrimination.  *See Dale*, 520 U.S. at 655 (holding that because "[t]he Boy Scouts takes an official position with respect to homosexual conduct," their policy constitutes "expressive association").  Plaintiff has raised material issues of fact as to whether gender and pregnancy discrimination motivated her termination.  As such, defendant could not prevail on a freedom of association defense unless it contends, which it does not, that its religious teachings require it to discriminate on such a basis.  Accordingly, this argument lacks merit.  Defendant's renewed application for summary judgment is denied.

### III.   Certificate of Appealability

Defendant also requests that the court grant it a certificate of appealability so that it may file an immediate interlocutory appeal of this decision.   Defendant made a similar request following the court's initial grant of summary judgment.  *See Redhead v. Conference of Seventh-Day Adventists*, No. 03-CV-6187, 2006 WL 2729035 (E.D.N.Y. Sept. 25, 2006).   Section 1292(b) of Title 28 provides a mechanism for permissive appeals of non-final orders that are otherwise not appealable as of right under § 1291.  *Nat'l Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 71 F. Supp. 2d 139, 145 (E.D.N.Y. 1999).  A district judge has discretion to certify an immediate appeal of an interlocutory order if three statutory requirements are met:  (i) a controlling issue of law exists; (ii) that involves substantial ground for difference of opinion; and (iii) an immediate appeal will materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b).  The district court must then certify that, in its opinion, the criteria are satisfied and shall state so "in writing in such order."  *Id.*

The court denies defendant's request because an immediate appeal will not materially advance the ultimate termination of this litigation.  Five years have passed since plaintiff filed her complaint in this action, and nearly seven years have passed since plaintiff was terminated from her position at the Linden School.  A trial, likely lasting three-to-six days, is scheduled to begin in less than two months from the date of this order.  An interlocutory appeal, on the other hand, inevitably will take months—and possibly years—to be resolved.  Given the imminence of trial, it is likely that the jury in this case will render its verdict before the parties would have finished filing their briefs in an interlocutory appeal.  *See* Fed. R. App. P. 31(a)(1).  As such, the court is convinced that granting a certificate of appealability at this time would be an inefficient

use of judicial resources.  Defendant's request is therefore denied.  The parties will, of course, retain their rights to appeal any decision that results from the trial.

## III.    Conclusion

For the reasons set forth above, the court denies defendant's renewed application for summary judgment in light of the Second Circuit's recent decision in *Cote*.  Additionally, the court denies defendant's request for a certificate of appealability.

SO ORDERED

DATED:    Brooklyn, New York
          June 27, 2008

_____/s/_____
DORA L. IRIZARRY
United States District Judge